UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 5:21-CR-75-DCR-MAS |
| WILLIAM R. HARGIS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court on Defendant's Motion to Suppress evidence found during a search after an alleged *Terry* stop. [DE 37]. The district judge referred this matter to the undersigned for a Report and Recommendation. The United States responded to the Motion. [DE 63]. The matter is ripe for decision. For the reasons stated herein, the Court recommends the District Court deny Defendant's Motion to Suppress.

**I.   FACTUAL BACKGROUND**

Defendant William R. Hargis ("Hargis") moves the Court to suppress evidence found after law enforcement conducted a *Terry* stop, canine sniff, and search of his vehicle. The facts leading up to the search of Hargis's vehicle on May 11, 2021, are well-documented in the record and will be set forth only briefly herein. [*See* DEs 1, 37, 38, 60, 63, 69, and 70].

On May 11, 2021, Lexington Police Department officers were conducting a narcotics investigation that led to a traffic stop of Hargis's co-defendant, Tiquan Richard Anderson ("Anderson"). [DE 69, Transcript of Suppression Hearing, p. 6, Page ID # 307]. Lexington Police Department Detective Brandon Hazelwood testified that the resulting search of Anderson's vehicle

uncovered marijuana, cocaine, fentanyl, and approximately one pound of methamphetamine. [DE 69, Tr. p. 6-7, Page ID # 307-8]. Anderson told investigators he obtained the methamphetamine from Hargis's other co-defendant, Lamonte H. Brown ("Brown"). Anderson also told investigators that Brown had a "stash house" for his narcotics at an office at 1795 Alysheba Way #1002. Anderson led investigators to the office suite and described the layout of the building and the door keypad of that particular unit. [DE 69, Tr. p. 6-7, Page ID # 308-9]. Anderson stated he had seen Brown and another individual cutting, packaging, and storing narcotics in that office. Det. Hazelwood testified he then observed Anderson make a FaceTime call to Brown to order three pounds of methamphetamine. [DE 69, Tr. p. 8-9, Page ID # 308-9]. Investigators maintained surveillance on the office building at 1795 Alysheba Way #1002. A short time after that call, a vehicle consistent with the one Brown was known to drive pulled into the parking lot, circled the officers' vehicles, and then left. Det. Hazelwood concluded that Brown had come to the office space to obtain the methamphetamine Anderson had just ordered via the FaceTime call, but that Brown left when he saw that there was law enforcement at the office. [DE 69, Tr. p. 9-11, Page ID # 310-12].

Investigators (other than Det. Hazelwood) continued to surveil the office building throughout the afternoon and evening of May 11, 2021. [DE 69, Tr. p. 11-12, Page ID # 312-13]. Det. Hazelwood learned the officers on scene observed a black GMC Denali park in front of 1795

Alysheba Way #1002, enter the building, exit five to ten minutes later, and put what appeared to be a black bag in the Denali.[12]

The United States offered testimony of several other officers regarding what happened next. As the Denali exited the parking lot of 1795 Alysheba Way #1002, Lexington Police Lieutenant Brian Martin began surveillance of the Denali. Lt. Martin testified he observed the Denali drive through several large parking lots in a "strange and erratic[]" manner. [DE 69, Tr. p. 31-32, Page ID # 332-33]. Lt. Martin stated that it was around 10:00 p.m. when he began surveilling the Denali, and the expansive parking lots of that commercial area were largely empty. [DE 69, Tr. p. 31-32, Page ID # 332-33]. Lt. Martin believed the erratic driving was consistent with someone conducting countersurveillance to determine if they were being followed. [DE 69, Tr. p. 31-32, Page ID # 332-33]. Because the parking lots were empty, Lt. Martin had to keep his distance in his undercover SUV, which he felt was too conspicuous to follow the Denali closely, but another undercover vehicle maintained constant visual contact with the Denali. [DE 69, Tr. p. 32-33, Page ID # 333-34]. The Denali eventually drove through the Target store parking lot and

---

[1] Much ado was made of this supposed black bag at the suppression hearing. Hargis claims a black bag was not found in his vehicle, and that the black object was a baby car seat. Body warn camera footage does show a black and pink baby car seat in the back passenger seat of the Denali. Officers testified Hargis placed the disputed black object into the hatch/trunk area of the Denali. The testimony and record are unclear as to whether law enforcement ever uncovered a black bag in Hargis or Johnathan Tye's vehicle. Nonetheless, this issue is not dispositive for the Court. The testimony was clear that the officers believed in good faith that Hargis carried a black object, potentially consistent with a black bag, from inside 1795 Alysheba Way and placed it in his Denali. Even if the officers were mistaken about what the object was, there was sufficient reasonable suspicion considering the totality of the circumstances to support the *Terry* stop.

[2] Hargis also challenged the search (pursuant to a state search warrant) of 1795 Alysheba Way #1002. *See* DE 38. The Court has separately addressed the probable cause supporting that search warrant in its Report and Recommendation at DE 70. The stop and search of Hargis and Tye's vehicles are not mentioned in the affidavit supporting the search warrant for 1795 Alysheba Way #1002. The Court analyzes the challenges to the search of 1795 Alysheba Way #1002 and the detention and search of Hargis and his vehicle as separate inquiries. The events were occurring nearly simultaneously and neither mentioned the other search as a basis for probable cause.

to the narrow parking spots on the side of the building. This side lot had customer parking spaces, but was not the main parking area for Target, which the surveilling officers found suspicious because there were ample available spaces in front of the Target store. [DE 69, Tr. p. 34-35, Page ID # 335-36].

The United States introduced video footage from the Target store's parking lot security cameras that showed the Denali pulling into a parking space and a sedan pulling into the space next to it. [DE 68, Gov. Ex. A, Target Surveillance Camera]. The individual in the sedan exited and got in the Denali, and soon thereafter exited the Denali and got back into the sedan. [DE 69, Tr. p. 42-43, Page ID # 343-44]. Within seconds, several law enforcement vehicles approached the parked cars. The officers exited their vehicles with weapons drawn, approached the Denali and sedan, and instructed both drivers to get out of the vehicles and lay on the ground. Officers ultimately determined Hargis was the driver of the Denali and Johnathan Tye was the driver of the sedan. Lt. Martin testified both drivers were immediately handcuffed because "oftentimes those involved in the trafficking of narcotics are armed, and for our safety at that exact moment, they were handcuffed so we could determine whether they had weapons on them or not." [DE 69, Tr. p. 42-43, Page ID # 343-44].

As he was being handcuffed, Hargis told Lexington Police Detective Brian Cobb that he had a firearm in the vehicle. Det. Cobb relayed that information to Lt. Martin, who removed the firearm from the front passenger floorboard. Hargis was detained for approximately ten to fifteen minutes waiting for Lexington Police Department Detective Roman Fowler to arrive with a narcotic sniffing canine. Det. Fowler testified he directed his canine, Nikko, to conduct a sniff of the Denali. Nikko alerted to the odor of narcotics at the driver's side front door of the Denali. [DE 69, Tr. p. 100-1, Page ID # 401-2]. Det. Fowler ended Nikko's sniff once he positively alerted to

the odor at that location and notified the other officers on scene that there was a positive alert. The other officers on the scene conducted the search of Hargis's Denali, which revealed a small amount of marijuana.[3] A subsequent search of Hargis' person uncovered additional contraband.

## II.   ANALYSIS

Hargis claims that the interaction with law enforcement that led to the search of Hargis's vehicle exceeded the scope of a *Terry* stop meaning the officers needed probable cause to detain, arrest, and search him. Hargis argues that because the officers did not have information rising to the level of probable cause, all evidence and statements obtained during the search of Hargis's person and vehicle must be suppressed.

The testimony and record were conflicting and unclear as to when, exactly, the various officers considered Hargis to be under arrest. The distinction is critical because Hargis's detention need only be supported by reasonable suspicion; his arrest, however, had to be pursuant to probable cause. More importantly for the purposes of this motion, the officers could pat down Hargis and remove the firearm from his vehicle during a valid detention in the interest of officer safety; a search of Hargis's person and vehicle, however, had to be pursuant to an exception to the warrant requirement, such as a lawful arrest and/or probable cause.

For the reasons stated below, the Court recommends the following findings: (1) law enforcement had reasonable suspicion to detain Hargis; (2) the extension of the Terry stop to permit a drug dog to sniff Hargis's vehicle was not in excess of *Terry*'s parameters; and (3) the resulting search of Hargis's person and vehicle were conducted based upon probable cause.

---

[3] Nikko also alerted to the odor of narcotics in Tye's vehicle. Tye had a large amount of supposed Xanax pills in his vehicle that he claimed to have obtained from Hargis in the Target parking lot in exchange for $5,000, just prior to their arrests. The search of Tye's vehicle is not at issue in this motion. Det. Hazelwood testified that officers recovered $5,000 in cash "either in Mr. Hargis's vehicle or on his person." [DE 69, Tr. p. 100-1, Page ID # 401-2]. This issue is addressed in Section D, *infra*.

A.    **V**ALIDITY OF THE *T*ERRY **S**TOP AND **H**ANDCUFFED **D**ETENTION OF **H**ARGIS

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In determining whether a stop exceeded the proper bounds of *Terry*, "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "Reasonable suspicion is more than an ill-defined hunch[,]" *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016), but it "does not present a particularly high bar." *United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019). The investigatory stop inquiry entails "a two-part analysis of the reasonableness of the stop." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). Courts "first ask whether there was a proper basis for the stop and, if the stop was proper, then . . . determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* (internal quotation marks omitted). "An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 22–24 (1968)).

Here, the officers had ample reasonable suspicion to approach Hargis and Tye's vehicles in the Target parking lot. Law enforcement had just observed Hargis enter and quickly exit an office space that had been identified as a drug stash house, put something in his vehicle, drive erratically through several parking lots, park in a secluded area, another vehicle approached the same secluded area, the driver of that other vehicle quickly entered Hargis's vehicle, and then quickly returned to his own vehicle. Hargis offered several innocent explanations for his conduct. These possible innocuous alternatives do not negate reasonable suspicion of criminal activity. "In

considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005). The totality of the circumstances here certainly gave rise to the reasonable suspicion that criminal activity was afoot: specifically, Hargis's conduct had all the classic hallmarks of a narcotics transaction. Thus, officers were permitted to conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

Further, the fact that multiple officers approached Hargis's Denali with their weapons drawn, ordered Hargis out of the vehicle and onto the ground, and immediately handcuffed him, did not convert the *Terry* stop into an unlawful detention or arrest. "The fact that [the defendant] was handcuffed prior to the officers having probable cause to arrest him does not affect the legitimacy of the *Terry* stop." *Marxen*, 410 F.3d at 332. In *Marxen*, the Sixth Circuit found that the investigatory stop of a vehicle matching the description of a vehicle involved in an armed robbery was within the bounds of a *Terry* stop because "officers may take reasonable precautions for their own protection. Such reasonable precautions include drawing and displaying weapons, the immediate removal of the occupants from the subject vehicle, and placing the occupants in handcuffs. Further, the fact that several police cars (as opposed to one) were used to accomplish the *Terry* stop does not alter this analysis." *Id*. As the Sixth Circuit affirmed later, narcotics investigations are no different. "[D]uring *Terry* stops concerning narcotics transactions, officers are entitled—without probable cause—to remove suspects from a vehicle immediately and place them in handcuffs as a precaution." *United States v. Slaughter*, 751 Fed. App'x 659, 662–63 (6th Cir. 2018) (citing *Marxen)*.

7

Sixth Circuit case law is clear: once law enforcement has reasonable suspicion to conduct an investigatory stop, as they did here, they may draw weapons, remove occupants from vehicles, and detain them—including with the use of handcuffs where officer safety requires it. Here, Hargis immediately told officers he had a firearm in his vehicle. Lt. Martin testified that "oftentimes those involved in the trafficking of narcotics are armed, and for our safety at that exact moment, they were handcuffed so we could determine whether they had weapons on them or not. At that point, though, I will say they're not under arrest, but they are being detained for our safety and further investigation. It's almost impossible for us to conduct an investigation and simultaneously keep ourselves safe without some kind of precaution." [DE 69, Tr. p. 45, Page ID # 346]. This approach to a handcuffed detention for officer safety is consistent with *Slaughter*, and within the limits of a stop pursuant to a narcotics investigation. Thus, the Court finds the initial encounter between Hargis and law enforcement in the Target parking lot, including the use of handcuffs, was a permissible *Terry* stop supported by reasonable suspicion.

B.     **EXTENSION OF THE *TERRY* STOP**

Hargis also claims, even if the encounter was a valid *Terry* stop, the stop was unreasonably prolonged, and the scope of the stop unreasonably exceeded. Hargis argues if not for the prolongation of the stop for the purpose of the canine sniff, the incriminating evidence found in Hargis's vehicle would not have been discovered.

"[I]n determining the reasonable duration of a stop, 'it is appropriate to examine whether the police diligently pursued the investigation.'" *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *United States v. Sharpe*, 470 U.S. 675 at 686 (1985)). "Simply put, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted). "[T]here is no rigid time limitation on the lawfulness of a *Terry* stop." *Id.* (internal

8

quotation marks omitted).  Rather, the Court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.*

Once more viewing the circumstances in their totality, the Court finds the scope and duration of the detention in this case was reasonable.  Here, the original purpose of the stop was to conduct a narcotics investigation with full consideration of the activity law enforcement had observed at 1795 Alysheba Way #1002 and in the Target parking lot.  The evidence in the record consistently suggests the time between when officers initially approached the Denali to the time the canine alerted to the odor of narcotics was, at most, ten to fifteen minutes.[4]  Thus, the canine unit's arrival and sniff search of the outside of the vehicle did not unreasonably extend the scope or duration of the stop under the circumstances.  Rather, the dog sniff amounted to a quick and minimally intrusive investigative tactic calculated to quickly confirm or deny the officers' suspicion that Hargis and the Denali were linked to drug activity.  *See Davis*, 430 F.3d at 354 (finding that officers had "reasonable suspicion to detain [a driver] for the additional approximately thirty to forty-five minutes it took for the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics"); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (concluding that the defendant "was not detained for an unreasonable length of time" where officers spent "approximately 35 minutes . . . waiting for a canine unit to arrive[,]" and "[t]he entire investigation thus lasted for less than one hour"); *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) ("The officers reasonably suspected the

---

[4] [DE 69, Tr. p. 46, Page ID # 347; Tr. p. 59, Page ID # 360; Tr. p. 62, Page ID # 363; Tr. p. 63, Page ID # 364; Tr. p. 113, Page ID # 414 (Officer Brandon Helm testifying that 21 minutes after he activated his body worn camera the Denali search had been completed.); Tr. p. 134, Page ID # 435 (Defense counsel agreeing that it took ten to fifteen minutes for the canine to arrive, though arguing this was an unreasonable delay).]

Suburban's occupants of illegal drug trafficking, and the canine narcotics sniff is directly related to investigating this suspicion. Moreover, the duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop[.]").

Hargis has neither offered authority nor pointed to facts showing that the canine sniff, conducted within approximately ten to fifteen minutes of stop initiation, improperly exceeded the investigatory stop scope or duration under the circumstances of this case.

### C. SEARCH OF THE DENALI

Having found that the *Terry* stop was not unreasonably extended for the purpose of the dog sniff, the Court necessarily finds that the evidence found in the resulting search of the Denali should not be suppressed. "An alert by a properly trained and reliable drug-detection dog 'is sufficient to establish probable cause for the presence of a controlled substance.' If the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012)(quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)) (internal citation omitted); *United States v. Howard*, 621 F.3d 433, 454–55 (6th Cir. 2010) (agreeing with the district court that "[t]he dog sniff provided the best reason to believe contraband might be found in the Suburban," and, combined with other suspicious circumstances, would convince "a man of reasonable prudence . . . that contraband or evidence of a crime would be found in" the vehicle) (internal quotation marks omitted). Once the canine alerted to the odor of narcotics in the Denali, the officers had probable cause to search the vehicle and all compartments within it.[5]

---

[5] Prior to the search, officers had removed and secured the firearm that was in plain view in the front passenger floorboard of the Denali. This was the firearm that Hargis told officers was in the vehicle as he was being handcuffed. Hargis does not appear to challenge the seizure of that

**D.    SEARCH OF HARGIS**

The record is unfortunately muddled regarding when law enforcement conducted a search of Hargis's person and what evidence that search uncovered. At a minimum, the search of Hargis revealed 5.7 grams of methamphetamine inside his wallet. The record conflicts regarding whether the $5,000 that was allegedly drug proceeds was found in the Denali or on Hargis's person, though the weight of the evidence more strongly suggests it was also found on Hargis's person.[6]

Additionally, it is not entirely clear from the testimony and evidence in the record when Hargis was searched. Although Hargis was initially detained, his detention unequivocally converted into an arrest at some point. Any evidence found as a result of a search of Hargis's person prior to his arrest was not supported by probable cause and must be suppressed. Evidence found because of the *Terry* frisk of Hargis or pursuant to a search conducted subsequent to his lawful arrest need not be suppressed. Thus, the remaining issue is when did the search of Hargis's person occur relevant to the creation of probable cause, namely the alert by the drug dog and search of the Denali, that Hargis was conducting a narcotics transaction.

The United States presented the testimony of two witnesses on this point, and their testimony directly conflicted. The Court must determine whether, in light of the conflicting

---

firearm—which occurred prior to the dog sniff—because the officers were permitted to enter the vehicle and retrieve the firearm during the detention to ensure their own safety.

[6] Det. Hazelwood testified that approximately $5,000 was located "either in Mr. Hargis's vehicle or on his person." [DE 69, Tr. p. 16, Page ID # 317]. The Affidavit in support of the Complaint stated that "a search of Hargis' person produced approximately $5,000.00 in U.S. currency[.]" [DE 1-1, ¶ 9 at Page ID # 18]. On Officer Helm's body worn camera footage from the Target parking lot, Officer Cobb affirms that there was a "wad of cash" that he felt in Hargis's pocket, but he "didn't take it out." [DE 68, Defendant's Ex. A, body worn camera footage titled "Helm Part 1" at 2:40-50]. The United States asserted that "[i]nside the Denali, officers located $5,000 in cash[.]" [DE 63 at Page ID # 281].

testimony and the record as a whole, the United States showed by a preponderance that Hargis was searched incident to his probable cause arrest, and not prior to that time while he was still detained.[7]

Initially, on direct examination, Det. Hazelwood testified as follows:

Q. Okay. Now, in regards to this stop at the Target parking lot, was Mr. Hargis placed under arrest?

A. Initially, he was just detained.

Q. Detained. At some point, was he arrested?

A. Correct.

Q. Do you know what the -- is there an interval that you can say he was physically under arrest?

A. **Once he was searched and methamphetamine was located on his person, he was placed under arrest.**

[DE 69, Tr. p. 17, Page ID # 318 (emphasis added)]. Det. Hazelwood testified he was "in charge" of the scene, but did not have direct contact with Hargis or place him under arrest. [DE 69, Tr. p. 35, Page ID # 336].

---

[7] "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Feldman*, 606 F.2d 673, n. 11 (6th Cir.1979). "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, (1993). Therefore, a defendant's showing that a warrantless search has occurred generally constitutes a prima facie showing of illegality, and the Government has the burden of showing that an exception applies. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir.2007). The Government must show by a preponderance of the evidence that the search and seizure was reasonable. *United States v. Matlock*, 415 U.S. 164, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). *United States v. Square*, 790 F.Supp.2d 626, 643 (N.D. Ohio 2011).

Next is Det. Cobb who initially detained and handcuffed Hargis, but, like Hazelwood, did not place him under arrest or search his person. Pursuant to the Court's questioning, Det. Cobb testified in direct contradiction to Det. Hazelwood:

> THE COURT: Okay. And in your mind, when was Mr. Hargis specifically placed under arrest?
>
> THE WITNESS: I don't know. I didn't place the charges on him. I don't know at what point they decided to arrest him.
>
> THE COURT: At some point, there were narcotics found in Mr. Hargis's wallet. Are you aware of that?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay. ***When was his wallet searched?***
>
> THE WITNESS: ***It was after he was under arrest.*** I don't know at what point. It was probably 15, 20 minutes after this specific time.

[DE 69, Tr. p. 87-88, Page ID # 388-89 (emphasis added)].

Upon review of the entire record, including extensive review of the body worn camera ("BWC") footage from the officers at the Target parking lot, the Court finds that the United States just sustained its burden of showing that Hargis was searched incident to his arrest for several reasons.

First, Det. Cobb handcuffed and performed a weapons pat-down on Hargis when Hargis exited the Denali. [DE 69, Tr. p. 83, Page ID # 384]. Det. Cobb testified he did not place Hargis under arrest and did not search Hargis. If Hargis was to be searched prior to his arrest, a reasonable mind would believe such an event would have occurred incident to his detention by Det. Cobb.

Second, Det. Cobb's version of events is bolstered, in part, by the BWC footage. On Officer Helm's BWC, Det. Cobb appears to be processing evidence found during the search of the vehicles when an off-screen officer (presumably Officer Helm) asks him, "Did you search him Cobb?" Det. Cobb responds, "Search who?" The off-screen officer states, "Somebody told me

13

he had a wad of cash on him." Det. Cobb responds, "It's in his pocket. I didn't take it out." [DE 68, Defendant's Ex. A, BWC footage titled "Helm Part 1" at 2:40-50]. This exchange further supports that while Det. Cobb felt the cash in the initial pat down, he had not searched Hargis to confirm the cash.

Third, Lt. Martin's BWC shows the officers searching the Denali when he inquires, "Have we found out if this guy has a – Shorty hasn't been able to do anything, has he?"[8] [DE 68, Defendant's Ex. A, BWC footage titled "Sgt Martin Part 3" at :30-37]. Lt. Martin then approaches Hargis, who is sitting handcuffed on a curb, and asks him for identification. Another officer bends down toward Hargis and states, "Where's it at? You got ID on you?" and then, "You got a pocket here?" [DE 68, Defendant's Ex. A, BWC footage titled "Sgt Martin Part 3" at :40-1:02]. It appears that the officer leans over as if to retrieve the identification from Hargis's pocket. [DE 68, Defendant's Ex. A, BWC footage titled "Sgt Martin Part 3" at 1:02]. The video ends at that moment, so the Court has no way of knowing what the officer did next. Again, like with the prior BWC, the conversation suggests that a search of Hargis's person had not occurred at this point because law enforcement had yet to determine his identification. Further, neither the United States nor Hargis argued that Hargis was searched (or was not searched) at this juncture. Finally, it is unclear from the BWC of all three officers whether this interact took place before or after Hargis was arrested. It is clear from the footage, however, that this interaction took place while the Denali was still being searched. [DE 68, Defendant's Ex. A, BWC footage titled "Sgt Martin Part 3"].

Considering Det. Cobb's testimony, his statement on Officer's Helm's BWC after the vehicle searches that he had not removed the "wad of cash" from Hargis's wallet, and Lt. Martin's

---

[8] It is apparent from the BWC that "Shorty" is the officer who was standing with Hargis once Hargis had been handcuffed and moved away from the Denali. "Shorty" is the same officer who asks Hargis where his identification is and bends down as if to retrieve it. The record does not reflect the true name of "Shorty."

14

statement on his BWC *during* the Denali search that the officers did not have Hargis's identification because "Shorty hasn't been able to do anything," the Court finds the United States met its burden by a preponderance of the evidence that Hargis's person was not searched prior to the search of the Denali, and that the search of the Denali precipitated his probable cause arrest. Although Det. Hazelwood's testimony directly conflicts with Det. Cobb's, the preponderance of the evidence supports Det. Cobb's' version of events. Thus, any evidence found on as a result of the search of Hargis's person need not be suppressed.

### III. CONCLUSION

For reasons stated herein, the Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [DE 37]. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b) (1), Fed. R. Crim. P. 59(b), and local rule, within **fourteen** days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

Entered this 22nd day of October.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge