UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 5: 21-075-DCR |
| V. | ) ) | |
| WILLIAM R. HARGIS, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant William Hargis has filed a motion to suppress evidence seized during an alleged illegal detention. [Record No. 37] Hargis contends that officers did not have probable cause to arrest him and then search his person and vehicle when he was detained in a Target parking lot. The motion was referred to United States Magistrate Judge Matthew Stinnett for review and issuance of a Report and Recommendation. Magistrate Judge Stinnett held an evidentiary hearing and, thereafter, issued his Report and Recommendation. [Record No. 72] Magistrate Judge Stinnett recommended that the Court deny Hargis' motion because law enforcement had reasonable articulable suspicion to stop him, the dog sniff of his vehicle did not exceed the scope of a valid investigative stop, and officers had probable cause to arrest Hargis. [*Id*.] Hargis objected to the magistrate judge's recommendation, contending that officers did not have reasonable suspicion to conduct a stop and that law enforcement's actions were tantamount to an arrest. [Record No. 76]

This Court considers *de novo* those portions of the magistrate judge's recommendations to which timely objections are made. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Having considered the matter, the Court will deny the motion to suppress. Hargis was not subject to an illegal detention in violation of his Fourth Amendment rights.

### I.

As explained in greater detail in the Court's previous Memorandum Opinion and Order denying Hargis' first motion to suppress, law enforcement officers initiated two controlled buys involving a confidential informant and co-defendant Lamonte Brown and conducted surveillance of Brown. [Record No. 75] Further, officers stopped co-defendant Tiquan Anderson on May 11, 2021, and found drugs in his vehicle. [*Id*.] Anderson later told law enforcement officers about narcotics being stored at 1795 Alysheba Way and placed a FaceTime call to Brown to order 3 kilos of heroin. [*Id*.] Anderson informed the officers that, if Brown needed to retrieve the narcotics, it would be from 1795 Alysheba Way. [*Id*.] Following the FaceTime call, officers observed a silver Dodge Ram truck, consistent with the truck Brown was known to drive, pull into the parking lot at 1795 Alysheba Way, circle the officers location, and then leave. [*Id*.] Lexington Police Department Detective Brandon Hazelwood sought a search warrant of 1795 Alysheba Way, while officers continued to conduct surveillance at that location. [Record No. 63-1]

While conducting surveillance, officers observed a black GMC Denali arrive at the location and a white male exit the vehicle and enter the building. [Record No. 69, pp. 12, 96] Soon thereafter, the white male exited the building carrying a "black bag," which was placed into the Denali and the individual left 1795 Alysheba Way. [*Id*.] Officers then

followed the Denali to a side parking lot at a Target store located at 1940 Pavilion Way. On the way to Target, one officer trailing the vehicle (Lieutenant Brian Martin) thought the Denali was "acting strangely and erratically." [Record No. 69, p. 32] Lieutenant Martin explained that this is sometimes an indication that drug traffickers are trying to figure out if they are being followed by the police. [*Id*. at 32.]

After the driver of the Denali parked in the Target parking lot, a burgundy Chevrolet Impala arrived. [Target Surveillance Video at 1:37-1:59] Officers observed an individual exit the Impala, enter the Denali, and then quickly exit the Denali and re-enter the Impala. [*Id*. at 2:20-2:48] Officers quickly approached the two vehicles with their weapons drawn and instructed the drivers to exit their cars. Officers immediately handcuffed Hargis, who was driving the Denali, and the driver of the Impala, who was identified as Johnathan Tye. [Record No. 69, p. 45, 50-51] Lieutenant Brian Martin testified that Hargis and Tye were handcuffed because in his experience, "oftentimes those involved in the trafficking of narcotics are armed, and for our safety at that exact moment, they were handcuffed so we could determine whether they had weapons on them or not." [*Id*. at 45.] He explained that the individuals were detained, not arrested, solely for the officers' safety and to be able to investigate without having to simultaneously worry about keeping the officers safe. [*Id*.]

Hargis told Detective Brian Cobb that he had a firearm in his vehicle. [*Id*. at 75.] Prior to placing Hargis in handcuffs, Detective Cobb conducted a pat down to check for other weapons. [*Id*.] Detective Cobb then informed Lieutenant Martin that there was a firearm in the Denali. [*Id*.] At some point, Tye told Detective Hazelwood that he bought

a large amount of Xanax pills (found during a search of his vehicle) from Hargis for $5,000.00 just prior to law enforcement approaching the vehicles. [*Id*. at 16, 129.]

A narcotics K-9 arrived about 10 minutes after Hargis was placed in handcuffs. [Target Surveillance Video at 12:40] Detective Roman Fowler arrived with his narcotics K-9, Nikko, and directed Nikko to conduct a sniff on the Denali. [*Id*.] Nikko alerted to the odor of narcotics on the front door of the driver's side. [*Id.* at 14:01; Record No. 69, pp. 87, 100-01.] Following the positive alert, Detective Fowler notified the officers and other officers conducted a search of the Denali, which revealed a small amount marijuana. [Record No. 69, pp. 77, 102] Lieutenant Martin retrieved the firearm from the Denali after the positive alert. [*Id*. at 46.] Hargis was also searched and methamphetamine was found in his wallet. [*Id*. at 17.]

Hargis was indicted for: (1) conspiring to distribute 50 grams or more of methamphetamine and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 846; (2) knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture of substance containing methamphetamine and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C § 841(a)(1); and (3) possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). [Record No. 21]

Hargis filed two motions to suppress. [Record Nos. 37, 38] Through the instant motion, Hargis contends that evidence seized from his person and vehicle following his detainment in the Target parking lot should be suppressed. [Record No. 37] Hargis asserts

- 4 -

that he was detained without probable cause, and the fact that he was immediately placed in handcuffs and the length of detention required probable cause, not just reasonable articulable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968).

Magistrate Judge Stinnett held an evidentiary hearing on October 5, 2021. The foregoing facts were offered through testimony presented during the hearing. Further, the United States argued that, while conducting surveillance at Alysheba Way, the defendant's behavior was sufficiently suspicious to warrant an investigative encounter; placing the defendant in handcuffs was necessary for officer safety; and that the search of the defendant's vehicle and subsequent arrest did not occur until after the positive alert by the K-9 and after Tye had told officers that the drugs that were found in his vehicle he had just bought from Hargis. [Record No. 69, p. 127, 139] Hargis argues that drawing weapons, ordering him out of his vehicle, and placing him in handcuffs required probable cause. He asserted that he was in custody at that point, and not just the subject of a brief, investigative detention. Thus, law enforcement needed probable cause, not just reasonable suspicion, to justify their actions. And in any event, Hargis asserts that there was no reasonable suspicion to support the initial stop, but even if there were, the time it took for a drug dog to arrive at the scene after he had been placed in handcuffs exceeded the scope of an investigative detention.

Magistrate Judge Stinnett has recommended that the Court deny the motion to suppress. [Record No. 72] He reasons that officers had reasonable suspicion to approach Hargis' vehicle in the Target parking lot. [*Id*. at 6.] Further, the magistrate judge concludes that the fact that multiple officers approached Hargis' vehicle with their weapons drawn

and immediately handcuffed him did not convert the stop into an arrest. [*Id*. at 7.] Next, Magistrate Judge Stinnett found that the scope and length of the investigative stop was reasonable. The time the officers initially approached the Denali to the time the canine alerted to the odor of narcotics was, at most, fifteen minutes. And this limited period was a minimally intrusive way to confirm or deny the officers' suspicions. [*Id*. at 9.] Additionally, the magistrate judge concluded that evidence found as a result of the search should not be suppressed because, once the K-9 had a positive alert on the vehicle, there was probable cause to search the vehicle. [*Id*. at 10.] Finally, Magistrate Judge Stinnett concludes that Hargis' person was searched after he had been arrested, and the search of his vehicle preceded his arrest. [*Id*. at 11-14.]

## II.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A person is "seized" within the meaning of the Fourth Amendment when, "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *Brown v. Lewis*, 779 F.3d 401, 413 (6th Cir. 2015). There are two types of seizures and each "garner[] a different level of scrutiny." *Id*. First, law enforcement officers may conduct a brief investigatory stop or detention (i.e., a *Terry* stop) when they have reasonable articulable suspicion to believe that "criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). Second, there is an arrest which requires that officers have probable cause. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008).

To warrant a *Terry* stop or detention, officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012). Courts consider the totality of the circumstances in determining if there is reasonable suspicion to initiate a *Terry* stop. *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011). In addition to requiring reasonable suspicion to initiate the investigative stop, the stop must be reasonable in scope. *Young*, 707 F.3d at 603.

An investigative stop can ripen into an arrest, which requires that the "detention of [a] suspect[] be based upon probable cause." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999). "[T]here is no bright line that distinguishes an investigative stop from a *de facto* arrest, [but] the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." *Id*. (internal citations omitted).

The sole issue raised in Hargis' motion is that he was detained without probable cause. [Record No. 64] But the matter is not so simple. First, the Court must determine whether the matter originally was an investigative detention, requiring only reasonable articulable suspicion or, whether placing Hargis in handcuffs at the outset of the investigative stop ripened the matter into an arrest. Next, if the matter was merely an investigative detention, the Court must consider whether there was reasonable suspicion to initiate the stop and whether the length of the detention exceeded the proper scope of an investigative detention. Finally, if the officers' actions constituted an investigative detention supported by reasonable articulable suspicion, the Court must determine whether

reasonable suspicion ripened into probable cause, allowing the officers to search Hargis and his vehicle.

At the outset, the Court concludes that the matter was originally an investigative stop, requiring only reasonable suspicion, until Nikko positively alerted to narcotics in the Denali. While Hargis argues that he was arrested as soon as officers approached the vehicle with their weapons drawn because he was immediately placed in handcuffs, merely placing Hargis in handcuffs did not ripen the investigative detention into an arrest. Handcuffing an individual or drawing weapons does not automatically convert an investigative stop into an arrest. *Smoak v. Hall*, 460 F.3d 768, 781-82 (6th Cir. 2006); *see, e.g.*, *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005). "Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo." *Valdez v. United States*, 58 F. Supp. 3d 795, 817 (E.D. Mich. 2014) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010)); *United States v. Slaughter*, 751 F. App'x 659, 662 (6th Cir. 2018) ("[D]uring *Terry* stops concerning narcotics transactions, officers are entitled – without probable cause – to remove suspects from a vehicle and place them in handcuffs as a precaution.").

Lieutenant Martin testified that Hargis and Tye were handcuffed because, in his "experience [], oftentimes those involved in the trafficking of narcotics are armed, and for our safety at that exact moment, they were handcuffed so we could determine whether they had weapons on them or not." [Record No. 69, p. 45] Additionally, Lieutenant Martin testified that handcuffing Hargis allowed the officers to conduct their investigation without

- 8 -

simultaneously worrying about their safety. [*Id*.] Detective Cobb also noted that they placed Hargis and Tye in handcuffs because "[n]arcotics investigations are inherently dangerous, including firearms. We typically handcuff a lot of people for narcotics investigations." [*Id*. at 84] Further, Hargis informed officers he had a firearm in his vehicle. The officers testified that Hargis was not arrested when they immediately placed him in handcuffs. Instead, their actions constituted a precautionary measure to protect their safety.

Hargis' argument that *Terry* does not allow officers to draw their weapons and place a suspect in handcuffs during an investigative detention is belied by applicable authorities. *See, e.g., Smoak*, 460 F.3d at 781-82; *Slaughter*, 751 F. App'x at 662. Based on relevant case law, officers may approach the subject vehicle with weapons drawn and place Hargis in handcuffs to protect officers during the investigative detention. Accordingly, the fact that Hargis was placed in handcuffs did not ripen the matter into an arrest.

Because merely placing Hargis in handcuffs did not ripen the detention into an arrest, the Court must consider whether there was reasonable articulable suspicion to conduct the investigative detention at the outset. As detailed in the Court's previous Memorandum Opinion and Order, officers had probable cause to believe that 1795 Alysheba Way contained narcotics and sought a search warrant for that location. [Record No. 75] The Sixth Circuit has noted that, "[g]iven the broad scope of a permissible *Terry* stop, several courts have allowed officers to pull over individuals seen driving away from a residence when the officers have obtained (or are about to obtain) a search warrant for the residence." *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021). Here, officers

observed: (1) Hargis quickly enter and exit 1795 Alysheba Way around the same time officers sought to obtain a search warrant; (2) the defendant drive erratically through multiple parking lots (which officers testified is a way that those involved in drug transactions attempt see if they are being followed); (3) the defendant park in a secluded area in a parking lot when there was a significant amount of open parking in front of the establishment; and (4) another car pulled along side and an individual quickly got in and out of Hargis' vehicle.  These observations support a finding of reasonable articulable suspicion to approach Hargis' vehicle and conduct an investigatory stop to determine if drug trafficking activity was afoot.  Based on the totality of the circumstances, officers had reasonable articulable suspicion to approach Hargis initially and conduct an investigatory stop.

Next, the Court considers whether the length of the detention was justified or if the matter over time ripened into an arrest.  "In assessing whether a detention is too long in duration to be justified as an investigative stop, [the Court] considers it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  The Court also evaluates whether the means used to confirm or dispel officers' suspicions were the "least intrusive means reasonably available."  *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006).

In *United States v. Davis*, the Sixth Circuit concluded that detaining a defendant for 30-45 minutes after the conclusion of a traffic stop to bring a drug dog to a scene to confirm or dispel the officer's reasonable suspicion that the defendant's car contained narcotics was

permissible. 430 F.3d 345, 354-55 (6th Cir. 2005); *see also United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (noting that a 35-minute wait for a canine unit to arrive and confirm or dispel if there were narcotics was reasonable). It explained that law enforcement had reasonable articulable suspicion to continue to detain the defendant beyond the conclusion of the initial traffic stop because officers saw the defendant meeting with a suspected drug dealer. *Davis,* 430 F.3d at 345. Further, the court explained that using a "drug-sniffing dog was a minimally intrusive means of investigating whether officers' suspicions that [the defendant's] vehicle contained narcotics," and the approximately thirty-minute wait for the drug-sniffing dog to be procured was not unreasonable in light of law enforcement's suspicions. *Id*. However, the first drug-sniffing dog did not alert to the presence of narcotics and the officers did not have grounds to continue to believe that the car contained narcotics. *Id*. at 356. Officers then continued to detain the defendant for an additional hour for a second drug-sniffing dog, which the Sixth Circuit concluded was unreasonable because no investigatory purpose was being served.

Here, officers had reasonable suspicion to believe that Hargis had retrieved narcotics from 1795 Alysheba Way and was engaged in a drug transaction with Jonathan Tye. Detective Fowler and K-9 Nikko arrived on scene less than ten minutes after Hargis' initial detention. And the time from which Hargis was detained until Nikko positively alerted to narcotics in the vehicle was less than fifteen minutes. This is significantly shorter than the 30 to 45 minutes in *Davis* and the Sixth Circuit has already concluded that bringing a drug-sniffing dog to the scene to confirm or dispel law enforcement's suspicion

- 11 -

that a vehicle contains narcotics is minimally intrusive. Here, both the length of the detention and the minimally intrusive means used to confirm or dispel the officers' suspicions were reasonable and did not violate Hargis' Fourth Amendment rights.

Prior to the positive alert from Nikko, the matter did not appear to ripen into an arrest. Hargis' was handcuffed to protect officer safety while officers conducted a brief investigatory stop to confirm or dispel their suspicions that Hargis was involved in drug trafficking. Officers testified that the search of the vehicle was not conducted until after the positive alert from Nikko. [Record No. 69, p. 46] Once a positive alert on the Denali occurred, officers were authorized to perform a warrantless search of the vehicle. *See United States v. Lyons*, 687 F.3d 754 (6th Cir. 2012). After a positive alert from a drug dog, officers have probable cause to search a vehicle for controlled substances. *See, e.g., United States v. Winters,* 782 F.3d 289, 304 (6th Cir. 2015). "Such probable cause extends to every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Id*. In the present case, officers did not search Hargis' vehicle until after Nikko had a positive alert that the car contained controlled substances. [Record No. 69, p. 87] Lieutenant Martin testified that they did not search the vehicle until after the positive alert. [*Id*. at 46.] In fact, officers did not remove the firearm that Hargis disclosed was in his vehicle until after the positive alert. [*Id*.] Because a positive alert from a drug-sniffing dog provides probable cause to search a vehicle for narcotics, the officers did not violate Hargis' Fourth Amendment rights by searching the vehicle following Nikko's positive alert for narcotics in Hargis' vehicle.

Finally, the Court considers whether the search of Hargis' person violated his Fourth Amendment rights. Generally, a warrantless search of a person is *per se* unreasonable under the Fourth Amendment. *California v. Acevedo*, 500 U.S. 565 (1991). One exception is a search incident to arrest, which allows law enforcement officers to search a person following a valid arrest. *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004). To be valid, an arrest just needs to be supported by probable cause, meaning that "the facts and circumstances within the officers' knowledge must be sufficient to warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). Additionally, "[a] formal custodial arrest need not precede the search as long as the formal arrest follows quickly on the heels of the challenged search and the fruits of that search are not necessary to sustain probable cause to arrest." *United States v. McCraney*, 674 F.3d 614, 619 (6th Cir. 2012).

Probable cause existed to arrest Hargis after the marijuana was found in his vehicle. Magistrate Judge Stinnett concluded that Hargis was not searched until after the vehicle had been searched based on: (i) conversations recorded on Lieutenant Martin's body cam footage that an officer had not yet "been able to do anything" while the search of the Denali was ongoing, (ii) Detective Cobb's testimony where he affirmed that it was not until after the positive alert from Nikko that Hargis was formally placed under arrest and then subsequently searched, and (iii) statements on Detective Brandon Helm's bodycam footage that alluded to Hargis not having been fully searched after an initial pat down occurred. [Record No. 72, pp. 13-14]

This Court agrees with the magistrate judge that Hargis was not searched until after the vehicle search uncovered marijuana, which, in turn, gave officers probable cause to arrest Hargis and conduct a search incident to arrest. Detective Cobb testified that Hargis was initially only detained when he was placed in handcuffs, and Detective Cobb affirmed that it was not until after the positive alert from Nikko that he was formally placed under arrest and then subsequently searched.[1]  [Record No. 69, pp. 88-89]  Lieutenant Martin's body cam confirms an officer explaining that he had not yet "been able to do anything" while the search of the Denali was still on going. And there is nothing in the record that contradicts the conclusion that Hargis was not arrested or searched until after the vehicle search uncovered contraband. The search of Hargis' vehicle uncovered a small amount of marijuana.[2]  [Record No. 69, p. 77]  Based on the search of the vehicle, officers had probable cause to formally arrest Hargis for drug trafficking activities and conduct a search incident to arrest.

---

[1] There is testimony from Detective Hazelwood stating that Hargis was not physically under arrest until after he was searched, and the methamphetamine was located in his wallet. [Record No. 69, p. 17]  While this conflicts with Detective Cobb's statement that Hargis was searched following his arrest, it does not conflict with Detective Cobb's statement that Hargis was not placed under arrest until after the positive alert from the K-9. *See Montgomery,* 377 F.3d at 588 (explaining that whether a defendant was placed in full custodial arrest before or immediately after the evidentiary search of his person, the search-incident-to-a-lawful-arrest rule would validate that search as long as there was probable cause at the time of the search). Based on the testimony, Hargis was formally arrested either right before or right after he was searched, and the Court concludes that there was probable cause to arrest and search Hargis based on the marijuana found in his vehicle.

[2] Detective Hazelwood explained that Tye stated he had just bought the $5,000.00 worth of Xanax pills from Hargis. [Record No. 69, p. 16, 129]  However, it is not clear exactly when Tye disclosed that he had bought the pills. Accordingly, the Court does not consider this information in determining whether there was probable cause to arrest and search Hargis.

In summary, the initial stop of Hargis was supported by reasonable articulable suspicion, the stop was not unjustifiably prolonged, and the search of the vehicle and Hargis were supported by probable cause.

### III.

Accordingly, it is hereby

**ORDERED** as follows:

1. The Report and Recommendation of United States Magistrate Judge Matthew Stinnett [Record No. 72] is **ADOPTED** and **INCORPORATED** here by reference.

2. Defendant Hargis' motion to suppress [Record No. 37] is **DENIED**.

3. Defendant Hargis' objections to the Report and Recommendation [Record No. 76] are **OVERRULED**.

Dated: November 8, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky