1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   CENTRAL DIVISION AT LEXINGTON
                               - - -
 3
     UNITED STATES OF AMERICA,     : Docket No. 21-cr-75-1
 4                                 :
                        Plaintiff, : Lexington, Kentucky
 5                                 : Monday, July 18, 2022
                                   : 1:00 p.m.
 6   v.                            :
                                   :
 7   WILLIAM RAY HARGIS,           :
                                   :
 8                     Defendant.  :

 9                               - - -
                       TRANSCRIPT OF SENTENCING
10                     BEFORE DANNY C. REEVES
          UNITED STATES CHIEF DISTRICT COURT JUDGE
11                             - - -

12   APPEARANCES:

13   For the United States:      ROGER WEST, ESQ.
                                 U.S. Attorney's Office
14                               260 W. Vine Street
                                 Suite 300
15                               Lexington, Kentucky 40507

16   For the Defendant:          ABRAHAM ISA MASHNI, ESQ.
                                 RUSSELL JAMES BALDANI, ESQ.
17                               Baldani Law Group
                                 300 W. Short Street
18                               Lexington, Kentucky 40507

19   Court Reporter:             ELAINE S. HABERER, RPR
                                 Official Court Reporter
20                               101 Barr Street
                                 Lexington, Kentucky 40507
21                               (859) 469-7456

22

23

24
          Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Proceedings commenced in open court at 1:00 p.m.)

2               THE COURT:  Thank you.  Madam Clerk, would you call

3     the matter scheduled for 1:00, please?

4               COURTROOM DEPUTY:  Yes, Your Honor.

5          Lexington Criminal Action Number 21-75, United States of

6     America v. William Ray Hargis, called for sentencing.

7               THE COURT:  Thank you.

8          Would counsel state their appearances, please?

9          Mr. West.

10              MR. WEST:  Yes, Your Honor, good afternoon.  Roger

11    West on behalf of the United States.

12              THE COURT:  And Mr. Mashni.

13              MR. MASHNI:  Good afternoon, Your Honor.  May it

14    please the Court, Abe Mashni and Russell Baldani on behalf of

15    William Ray Hargis, who is seated to our right.

16              THE COURT:  All right.  Thank you.  This matter is

17    scheduled for a sentencing hearing this morning -- this

18    afternoon, excuse me.  Before we proceed with the hearing, let

19    me first confirm that Mr. Hargis has had the opportunity to

20    review his presentence report and also to discuss it with

21    counsel to his satisfaction; is that correct?

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  All right.  Mr. Hargis, your presentence

24    report will be filed in the record under seal.  It is

25    available if the parties should need it for any reason,

1    however, it's not available for the general public to review.

2    There are no objections to the presentence report, and,

3    therefore, I will adopt the findings contained in the report

4    as well as the guideline calculations.  Before I review those

5    calculations with the parties, I'll note for the record that I

6    have received the sentencing memorandum and motion for a

7    variance filed on behalf of Mr. Hargis on July 8th; it appears

8    as Record Entry Number 138.

9    If the parties have any additional information they would

10   like to call to my attention that's relevant to sentencing

11   under Title 18, Section 3553, please do so during allocution

12   in the case.

13   And then, turning to the presentence investigation

14   report, that does contain the offense level calculations and

15   the criminal history score.  The offense level calculations

16   begin at paragraph 22 of the report.  The 2021 edition of the

17   guideline manual has been used to perform these calculations.

18   The counts of conviction, Counts 1 and 2, do group for

19   purposes of determining a guideline range, it's based on drug

20   quantity.  And the base offense level is a level 38.  There's

21   also a two-level increase under 2D1.1(b)(12) for maintaining a

22   premises for the purpose of manufacturing or distributing a

23   controlled substance.

24   Count 5 is the conviction on conspiracy to commit money

25   laundering, and the Court applies the base offense level from

1    proceeding counts base level 40, base offense level.  There's

2    a two-level increase based upon the defendant being convicted

3    under 1956 of Title 18, and then a two-level increase based

4    upon the defendant's position as an organizer, leader, or

5    manager as set forth in 3B1.1(c).  That creates an adjusted

6    offense level of 44 in the case.

7        There's then a three-level reduction shown for acceptance

8    of responsibility.  Before the Court may apply the third level

9    of acceptance credit under Section 3E1.1(b), it does require a

10   motion from the government.

11               MR. WEST:  We make that motion at this time, sir.

12               THE COURT:  That motion is sustained, and that has

13   the effect of reducing the total offense level to level 41.

14       Information regarding Mr. Hargis' criminal history is

15   contained in Part B of the report.  As set forth in

16   paragraph 51, he has five criminal history points that would

17   place him in Criminal History Category 3 for purposes of

18   calculating the guideline range in the case.

19       The statutory provisions are contained in Part B -- D,

20   excuse me, paragraph 67 to Counts 1 and 2, have a minimum --

21   well, excuse me, I also neglected to mention earlier the final

22   count, Count 4, which is possession of a firearm in

23   furtherance of a drug trafficking crime, which does require a

24   minimum of a five-year period of incarceration consecutive to

25   any other term of imprisonment imposed by the Court.

1          And then getting back to Part D, the first two counts,

2   Counts 1 and 2 have minimum terms of incarceration.   Each

3   would require a term of ten years to a maximum of life.   The

4   minimum term for Count 4 is, again, five years, that would be

5   consecutive.   And then for Count 5, the maximum term of

6   imprisonment is 20 years.

7          The guideline provisions are set forth in paragraph 69.

8   The guideline range in this case, based upon the total offense

9   level of 41, Criminal History Category 3, would be a range of

10  360 months to life; that would be Counts 1 and 2.

11         Count 5, maximum statutory penalty is 240 months.   So

12  it's less than the guideline range, and that's the maximum

13  that may be imposed for that count.   And then that becomes the

14  guideline range for that count.

15         And then, with regard to Count 4, 60 months consecutive

16  to other counts under 5G1.2.

17         The guideline provisions and the statutory provisions for

18  supervised release, as set forth in paragraph 71 and 73, are

19  also adopted by the Court.

20         The fine range in the case is a range of $20,000 on the

21  low end according to the fine table, and then the maximum fine

22  is, according to statute, the maximum fine may be $20 million

23  in this case.

24         Those are the relevant guideline provisions as well as

25  statutory provisions that are adopted in this matter.   And the

1   counts I referenced earlier are the second superseding

2   indictment in this case.

3        Mr. West, are there any motions to be taken up before we

4   proceed with allocution?

5            MR. WEST:  Yes, Your Honor, the defendant entered an

6   open guilty plea to this indictment, therefore, there are no

7   counts to dismiss on this indictment.

8        As to the 21-cr-75, that superseding indictment, we'll

9   move to dismiss those, as well as Count 2, 21-cr-046-SS.

10  That's the one that he was on with Demetrius Catching, Your

11  Honor.

12           THE COURT:  All right.  That motion will be

13  sustained, and those additional matters will be dismissed

14  effective upon entry of the judgment in the case.

15       There being no other motions other than the motion for a

16  variance that is discussed in the sentencing memorandum, we

17  will proceed with allocution at this time.  And Mr. Mashni or

18  Mr. Baldani, I'll hear from you at this time, and also from

19  Mr. Hargis if he would like to address the Court.

20       Mr. Mashni.

21           MR. MASHNI:  Thank you, Your Honor, may it please the

22  Court.  At the outset I want to mention the family support

23  that Mr. Hargis has in the courtroom today.  There's been many

24  people that have traveled long distances to be here,

25  especially South Carolina.  He's got friends, family, that

1     want to show their support here today.

2              THE COURT:  Yes, sir.

3              MR. MASHNI:  As indicated in the PSR, our sentencing

4     memorandum, and the letters from family, Mr. Hargis did not

5     have the best upbringing.  It started with him being

6     physically abused, sexually abused, grew up in poverty where

7     his basic needs were not consistently met.

8          He was exposed to domestic violence between the people

9     that he was to look up to, as well as substance abuse and

10    addiction issues in the home -- in both homes.  And whenever I

11    say homes, he vividly recalls moving between the ages of

12    kindergarten to 12th grade over two-dozen times.  As a result

13    of that trauma that he underwent growing up, he had suicidal

14    ideations, he had cutting as a teenager which caused him to

15    attend The Ridge, an in-patient treatment program, for a

16    couple of weeks as a teenager.

17         Growing up, as an adult -- well, I wanted to point to the

18    letter that he wrote to the Court, specifically the aspect of

19    in high school, when he started selling marijuana, I think

20    that that was a candid, honest testament to where we are at

21    today.

22         He says that it started with at first selling it so that

23    he could smoke for free, or for not as much money.  Then it

24    turned into him being popular in school, and him being known

25    as the guy; him receiving some form of immature adulation from

1    his peers.

2        Your Honor, a lot of people have said that marijuana is a

3    gateway drug.  For him, it was a gateway into drug

4    trafficking; it was a gateway into living a life that he was

5    not afforded growing up; it was a gateway to having financial

6    issues; it was a gateway that obviously has tremendously

7    increased that have led him here today.

8        In his criminal history, he has DUI, some possession of

9    marijuana charges, he has -- there was a small amount of

10   marijuana trafficking charge, but no felonies, and all in all,

11   I think he had spent 56 days in custody prior to this event

12   today.

13       Make no mistake about it, this is a very, very serious

14   charge, allegations, convictions, facts, this is a very

15   serious case, and he fully acknowledged that.  So I wanted to

16   take some time and talk about his acceptance of responsibility

17   in this case.

18       We filed two motions to suppress based on legal reasons

19   that we have litigated and argued today -- or in the past.

20   When those motions were denied by the Court, we immediately

21   pivoted to accepting responsibility, pleading guilty, and

22   coming before this Court in order to plead guilty.  There was

23   no games that were played by Mr. Hargis.  He didn't try to get

24   new counsel, he didn't get to the brink of a trial.  He -- we

25   talked about open pleas, binding pleas, conditional pleas, and

1    so when those motions were exhausted, it turned to accepting

2    responsibility, which we have done and which --

3         THE COURT:  So your argument is, essentially he was

4    not prepared to accept responsibility until he lost on the

5    legal issues and then he suddenly accepted responsibility?

6         MR. MASHNI:  Your Honor, I think everybody has a

7    right to make sure that the case itself --

8         THE COURT:  Absolutely.  Absolutely.  But in terms of

9    mindset, when a person accepts responsibility for their

10   actions chronologically, that's essentially your argument.

11        MR. MASHNI:  Our argument is that he played no games

12   and accepted responsibility as soon as those motions were

13   denied by the Court.

14        THE COURT:  All right.

15        MR. MASHNI:  As noted today that this was a

16   nonbinding plea that Mr. Hargis had entered.  When the parties

17   entered the plea, it was envisioned, or it was put into the

18   plea agreement that it was going to be a 37 base offense

19   level.

20        Now, we understood, and it was made perfectly clear to

21   Mr. Hargis that it was up to the United States probation

22   officer to correctly calculate the guidelines.  And so --

23   which they did today, and which we did not object to any of

24   the guidelines.

25        Second, I think when you're looking at the gravity of the

1    offense here, I believe the government would agree, we're here

2    today on a drug trafficking case; that is the severe charge,

3    and the quantity amount and the drugs and the guns.

4         THE COURT:  How much -- let me back up a minute.  In

5    2017, the Sentencing Commission changed some of the

6    terminology; it didn't really change the outcome, but it

7    changed terminology in the table 2D1.1.

8         We used to refer to drugs, when you do this conversion,

9    to converted marijuana weight, essentially, or marijuana

10   equivalency, but now we use converted drug weight.  And the

11   very highest base offense level you can get in the guidelines

12   under 2D1.1 for drugs is a 38, and it takes 90,000 kilograms

13   of converted drug weight to get to base offense level 38.

14        This case has five times more than that top number to get

15   to base offense level 38, doesn't it?  514,000 kilograms

16   converted drug weight?  So this is not necessarily similar to

17   other cases that top out in base offense level 38, because

18   there's no higher number we can go to.

19        MR. MASHNI:  Your Honor, I expect that that number

20   that is included in our -- in the PSR, which we agreed with,

21   includes the amount of fentanyl that was found in the office

22   building.

23        THE COURT:  Yes.  All right.

24        MR. MASHNI:  The government has conceded that

25   Mr. Hargis has -- is not responsible for that, and that is one

1   of the co-defendants in this case that is responsible for

2   that.  However, he had a very large amount which is attributed

3   to him of methamphetamine located in that office building.

4          THE COURT:  Right.  And if you take out any other

5   drug and you only consider crystal methamphetamine, you're

6   still well over base offense level 38.

7          MR. MASHNI:  Agreed.  So I understand that and so I

8   just wanted to point out that we're not arguing what the base

9   offense level is.  We understand that the quantity is still

10  very high.

11         THE COURT:  And you haven't objected to total

12  quantity converted drug weight of 514,000 kilograms.

13         MR. MASHNI:  Correct.

14         THE COURT:  And my point is, this is five times more

15  than necessary to get to base offense level 38.  So when we

16  start to compare cases, as you've done in your sentencing

17  memo, that's fairly significant.

18         MR. MASHNI:  Understood, Your Honor.

19      I want to talk about the -- again, while we are not

20  making a legal objection to how the guidelines have shaken out

21  here, I think that it's important to note that the drugs are

22  the thrust of the case as the Court has aptly pointed out.

23         THE COURT:  Well, that's what you point out, but

24  actually the drugs are just a part of the case.  We have

25  firearms, we have money laundering, and that results in those

1    additional enhancements in addition to that base offense

2    level.

3          MR. MASHNI:  The money laundering specifically has a

4    statutory cap of 240.

5          THE COURT:  But it also adds a two-level increase in

6    the total offense level.

7          MR. MASHNI:  Agreed.  And so, it is essentially

8    taking it up eight years from what the drugs and the guns

9    would have been, up eight years to 360 to life.  And just --

10   I'm just -- I just wanted to point out the oddity that a

11   charge that Congress has said put out 240 as the maximum has

12   increased at the levels here.

13         THE COURT:  Right.  In other words, we're not going

14   to ignore the fact that the defendant was engaged in money

15   laundering activities; it does affect the guideline

16   calculation in the case, although the statutory maximum is

17   240 months.

18         MR. MASHNI:  Correct.  I don't have the statistic

19   that I pointed out in the memo about the 14 individuals that

20   have had this base offense level along with this criminal

21   history category and the average and the mean sentences that

22   they have received whenever you take out the people with 5Ks.

23   I don't have any information as to what type of quantities

24   those people possessed, as far as if it was right at the

25   number of 38 or if it was far more than -- I just don't have

1    access to those statistics.

2        THE COURT:  Right.  And there's a lot of information

3    that we don't have access to that would be contained in those

4    individual presentence reports.  Family circumstances, do

5    those individuals have family support?

6        What is the nature of their criminal history?  For

7    example, criminal history is important in calculating a score,

8    criminal history category, but the nature of criminal history

9    is also important because we know that as criminal history

10   increases, or points or criminal history categories increase

11   that the likelihood of recidivism increases.

12       So if a person does have a likelihood of committing

13   another offense for various reasons, various individual

14   characteristics, then that's something that goes into a

15   sentence, an overall sentence in the case.

16       Courts consider those individual characteristics and we

17   don't have any of that with regard to the cases that you

18   reference, these other 13 or 14 cases.

19       MR. MASHNI:  Right.  Just that they ultimately ended

20   up in the same criminal history category as Mr. Hargis is in

21   today.

22       THE COURT:  And this is the present argument that's

23   being made, really, across the district and nationwide under

24   3553(a)(6).  And that is, we look at -- we compare an

25   individual's guideline range with means or median sentences

1  with persons that have committed similar offenses.  And we

2  know what their base offense level or total offense level is,

3  and we know what their criminal history score is, and that's

4  about all we know.  And we make these comparisons, and then we

5  say -- counsel or attorneys often argue, this is the mean or

6  the median for this type of an offense with this person, and,

7  therefore, he shouldn't be sentenced above that, he should be

8  sentenced below that.

9      So we're creating this artificial ceiling in cases and

10  we're saying, don't go above that, let's go below that for

11  various reasons because these other people have had sentences

12  generally at that level, but we don't know anything about

13  those other cases other than the criminal history score and

14  their total offense level for the most part.

15      So aren't we really kind of getting back to *Booker*?  I

16  mean, 2005, the Supreme Court decided *Booker* and said you

17  can't just mechanically apply the guidelines.  Sentencing is

18  individual and you have to look at all these factors of 3553.

19  And so suddenly now we're getting back to these arguments

20  under 3553(a)(6) that you need to look at these numbers, these

21  specific numbers without regard to individual characteristics

22  in these other cases that we're comparing, and impose a lesser

23  sentence in this particular case.  So it seems like we've come

24  full circle with the *Booker* arguments.

25          MR. MASHNI:  Your Honor, I don't pretend to know what

1    the circumstances are in those other cases; we've used it as a

2    guiding reference for -- to satisfy the requirement of

3    3553(a)(6), and that, in conjunction with all of the

4    mitigating factors that we put into our memo, such as the

5    minimum amount of time that he's spent in custody prior to

6    this; the disadvantaged childhood; the things that he's done

7    while in custody to better himself; the reading the 20

8    self-help books along with the Bible; and the young age that

9    he is, 24 years old.  And so, for all of those reasons

10   combined, we were asking for a below guideline sentence.

11            THE COURT:  I do want to ask you one other question

12   about the argument that you made.  You brought a lot of people

13   in court; they appeared here supporting the defendant.  So he

14   does have family support; friends and family members are

15   supporting him, and that's something that he didn't have when

16   he was younger when he was growing up.  And the argument is,

17   he had a disadvantaged childhood and upbringing and,

18   therefore, that should be considered in imposing the sentence.

19        But going forward, at the time he committed these

20   offenses, I assume that he had family support and support from

21   friends.  So all the folks that are here today supporting the

22   defendant when he was committing these offenses, it certainly

23   didn't stop him from committing the offenses, but what's to

24   say that the family support will have an impact going forward

25   in terms of recidivism?

1     Because one of the goals of sentencing is to protect the

2     public, to deter criminal conduct.  And arguments are often

3     made that a person now has family support that will prevent

4     him from engaging in criminal conduct, but my point is to you,

5     my question is to you, he's got the support now, hopefully

6     he'll have the support going forward, but it didn't prevent

7     him from committing very serious offenses.

8          MR. MASHNI:  Your Honor, I think the answer would be

9     that the family didn't know the severity of what type of

10    involvement he had in these actions.  It came as a shock to

11    them.  I think that he has some grandparents that have lived

12    in South Carolina that tried to be caretakers to him and

13    provide for him when needed.  And obviously, they're here

14    today to show their support, but they didn't live in Kentucky

15    at the time.  It's partly the reason why he's going to be

16    asking for a recommendation for a BOP facility in South

17    Carolina.

18         And so, yes, he had the disadvantaged childhood, yes,

19    there are people here that want to support him.  And to the

20    Court's question, I don't believe they -- they knew that he

21    had had run-ins with the law, which, as seen in his criminal

22    history, he's had multiple misdemeanors.

23         However, to go from multiple misdemeanors to a case of

24    this severity, I believe that they were in the dark.

25         THE COURT:  All right.  Well, I appreciate your

17

1    responding to that question.  Thank you.

2            MR. MASHNI:  Thank you.

3            THE COURT:  And Mr. Hargis, if you would like to add

4    anything to what your attorney has said, you can certainly do

5    so at this time.

6            THE DEFENDANT:  Your Honor, in my letter to you I

7    gave you just a glimpse of what my life was like.  And

8    although my decisions today that brought me here, the things

9    I've learned bring me even further in life.  Every mistake

10   I've made came with consequences as well as lessons.  And

11   trust me, I've learned a lot because of that.  But one thing

12   stays the same throughout every one of those, and it's not how

13   you fall that defines you, but it's how you get back up.

14       You can ask anyone in this courtroom behind me and they

15   will tell you that I've had a rough life, but they will also

16   tell you that my past isn't a true reflection of the man I am

17   today.  I've also learned that anything you want out of life,

18   if you want it bad enough and have enough faith in yourself to

19   go and get it, then you eventually will.

20       I found the love of my life and have three beautiful kids

21   because of that.  Now there's only one thing left for me to do

22   and it's more important than anything I've ever done.  That's

23   to get back out there to my babies and be the best father I

24   can be.

25       This is a promise to you and them, that I will not stop

1    trying until I could -- stop trying until I can have proven

2    that I could be a positive and a productive member of society.

3         No matter what the outcome of today is, I'm going to use

4    this time as a stepping stool into a better way of life, free

5    from addiction, lust, greed, and crime, because God is now

6    leading the way.

7         I plan on using my time to better myself.  And if given

8    the opportunity, I'd like to enroll in RDAP, have a mental

9    health assessment, and follow through with any recommendations

10   that may apply.

11        I would like to attend the EARN Program and take the

12   Challenge Program, and if I could get in any vocational

13   classes, I would also like to learn how to do welding or

14   commercial driving.

15        I plan on spending any other of my free time in the

16   chapel strengthening -- strengthening my relationship with

17   God.

18        I would also like to openly apologize to you, the courts,

19   my family, and anybody who may have been hurt because of my

20   actions.

21        I'm sorry, Your Honor, and to everyone here supporting

22   me, I'm sorry.  I love you all, and the decisions I made were

23   dishonest and selfish.  It was never about what I could give

24   you, and I wish I would have realized it sooner that you just

25   wanted more of me.  Thank you.

1          THE COURT:  All right.  Thank you.

2      And Mr. West.

3          MR. WEST:  Yes, sir.  Thank you for the opportunity

4  to speak in response to the motion for variance.  I would

5  disagree with some of the statements defense counsel make and

6  Mr. Hargis makes.

7      In paragraph 47 of the PSR it lists an original felony

8  charge of trafficking marijuana that was amended to a

9  misdemeanor and he served 90 days.

10          THE COURT:  That's -- unfortunately, that's not

11  unusual in state courts in Kentucky.

12          MR. WEST:  Not at all.

13          THE COURT:  Or in a number of states, quite frankly.

14          MR. WEST:  That's correct, sir.  In paragraph 49, he

15  was arrested for possession of marijuana, and found a stolen

16  Glock handgun in his possession.  In the Demetrius Catching

17  case for which this defendant traveled to Indiana with

18  Mr. Catching, when they are stopped in Indiana, there was a

19  firearm found that Mr. Hargis claimed to be his.  When he was

20  stopped on this offense, on May the 11th, he had a

21  9-millimeter Glock with an extended magazine in his possession

22  in the Yukon that he was driving.

23      Each one of those offenses in and of themselves should

24  have been the red flag warning that possession of firearms,

25  engaged with drug trafficking, is a huge crime.

20

1        Now, I would respectfully disagree with defense counsel

2   that the weight of the drugs, that's what's driving this case.

3   No, Mr. Hargis' prior record also is a contributing factor.  A

4   level 38 is extremely high for the Eastern District of

5   Kentucky.

6        THE COURT:  Well, we can't get higher in terms of

7   drug quantity.

8        MR. WEST:  No, you would think we could not.  But

9   when this case was first brought to my attention that there

10  were over 50 pounds of crystal methamphetamine, I initially

11  did not believe it, because we've never had that high.

12       THE COURT:  Is that the max that you've handled, case

13  that you've handled?

14       MR. WEST:  It is, sir, yes.  In the conversion

15  weights, it was 52.8 pounds of marijuana -- of

16  methamphetamine.  In the -- as the Court stated, the converted

17  drug weight is 19 kilos.  That amount of methamphetamine, I

18  don't have words that can describe the impact that 55 pounds

19  would have made in this area -- I'm sorry, 52 pounds.

20       When we have drug addicts every day dropping, dying from

21  this amount of use and the use of the approximately one gram

22  is a dosage amount, I didn't do the math, Judge, it's just too

23  high.

24       Coupled with the fact that these are deadly firearms.

25  This is not a simple single shot 38-caliber revolver.  For

1    lack of a better term, and this is probably not a legal term,

2    but these are wicked looking firearms.  And the defendant had

3    all of them stored with his crystal methamphetamine.

4        Looking at this case in its entirety, I used this word

5    earlier today, but this is a degree of sophistication in

6    regards to crystal methamphetamine.  Once again, the added

7    fact is that we have an individual that was stopped in

8    Covington airport that was taking a volume of cash to

9    California to pay for previous loads or pay for future loads.

10       When you're at the top of the pile here in the Eastern

11    District of Kentucky, and it's one step away from the

12    suppliers in California, that's enormous; absolutely enormous.

13       Mr. Hargis said he grew up in poverty and other factors.

14    We see that almost every day.  It is not an excuse for his

15    conduct.  It's not even a reason for his conduct.  So many

16    instances in his prior record where he could have stopped but

17    yet, he sought the attention of others as a drug trafficker in

18    high school.

19       What that means, of course, is there are individuals who

20    look up to that scenario, that you drive a fancy car and that

21    you have guns on you, that you associate with individuals with

22    lots of money.  That's detrimental to our society as much as

23    52 pounds of methamphetamine.

24       Now, his family is here today, and I appreciate all their

25    support.  I bet they didn't know the level of a trafficker

1   this guy was when they walked in here.  I've seen his mother

2   at every single court appearance that he's been here except

3   one, and it was the small hearing, one of the last we had.

4   That's the support he had, but yet, he turns his back on that.

5   He rented an office space away from his home, away from any

6   scrutiny, to deal in this volume of drugs.

7       Your Honor, I oppose -- the United States opposes a

8   variance in this matter.  Every single day that Mr. Hargis

9   must serve, he earned it.  He earned it.  Thank you, sir.

10      THE COURT:  The guideline range does provide the

11  Court a starting point for the analysis of what would be an

12  appropriate sentence in this case.  And we have discussed

13  these issues, calculations under the guidelines.  First two

14  counts have a guideline range of 360 months to life.

15      Now, that does include and, of course, drug quantity, but

16  it also has as an element the fact that he was laundering drug

17  money as well.  The drug quantity in this case, if we just

18  look at crystal methamphetamine, is a staggering number, and

19  it does create at least a base offense level that's as high as

20  it gets in the guidelines when we only look at drugs under

21  2D1.1 and the tables that are contained in that section.

22      The defendant was also operating or maintaining a

23  premises for that distribution activity, office location in

24  the Hamburg area of Lexington, controlled facility, and not

25  only did the defendant have a firearm in his possession at the

1    time he was arrested, but there were a number of other

2    firearms as well in the storage facility where drugs were

3    being maintained.

4        And that does result in that 60-month mandatory minimum

5    term that will be applied in this particular case under that

6    count.  So this is a very serious offense.

7        The Court also considers, in addition to the guidelines,

8    these factors, and one is the seriousness of the offense.

9    Under the guidelines and under the statutory section, excuse

10   me, Title 18, Section 3553, the Court does consider the

11   circumstances of the offense.  Very negative in this

12   particular case and very serious, as well as the defendant's

13   history and characteristics.

14       As the United States indicates, it's not unusual to have

15   a defendant that does have either a poor upbringing or has a

16   number of disadvantages during childhood, and then even into

17   adulthood.  That's the case here, but in this particular case,

18   while it may be in some cases a mitigating factor, I don't

19   conclude that it would be in this particular circumstance and

20   would not be a reason to depart below a guideline range or

21   vary below a guideline range.

22       The offense is one of the most serious that we see in

23   this district.  There is a need to promote respect for the

24   law.  I do consider the nature of criminal history.  The

25   defendant has limited criminal history, as counsel has

1      referred to the misdemeanor convictions, but that does not

2      prevent the Court in this particular case from going below the

3      guideline range even though there are no serious felony

4      convictions in this matter.

5           As Mr. West, and as the defendant acknowledge -- and

6      through his letter that he's written -- he has been involved

7      in some sort of drug trafficking activities at least since

8      high school, and he's engaged in drug trafficking for the lure

9      of money, prestige.  And there is a need to provide deterrence

10     for the defendant as well as for others that might be inclined

11     to engage in that type of conduct.  And in doing so, it will

12     provide some measure of protection to the public as well.

13          So based upon all the information provided in the

14     presentence report as well as in the sentencing memorandum, I

15     don't find a reason to go below the guideline range in the

16     case.

17          I study carefully information from the Sentencing

18     Commission with regard to how certain individuals are

19     sentenced, the sentences that are imposed, but sentencing is

20     individual.  And ultimately, the sentence to be imposed in a

21     case is based upon all of the unique characteristics of a

22     defendant that include nature of criminal history as well as

23     the nature of the offense, drug quantity information, type of

24     drugs, distribution activities, possession of firearms in

25     furtherance, and in this case, of course, money laundering

1    activities as well.

2        So this is a very serious case with egregious

3    circumstances.  I will make recommendations to the Bureau of

4    Prisons with regard to some training for the defendant as well

5    as some programs that the BOP offers.  There are a number of

6    programs that are currently offered through the BOP, not just

7    the RDAP program, but, for example, the BOP publishes what's

8    referred to as the First Step Act, Approved Programs Guide.  A

9    copy that I often reference is the October of 2022 program

10   guide.  This does change from time to time, and the defendant

11   can take advantage of a number of those programs.  But I will

12   be including recommendations with regard to job training and

13   substance abuse treatment.

14       Now, perhaps he will not qualify for the RDAP program

15   based upon the nature of these offenses, specifically the

16   firearms offense, but it may be that the requirements to

17   qualify for those programs may change over time, and so I will

18   include language that will recommend the defendant's

19   participation in any available substance abuse treatment

20   program, as well as participation in a mental health program.

21   I do believe that is certainly necessary for appropriate

22   rehabilitation in the case.

23       Now, with regard to issues of age, there was an argument

24   made about the defendant's age, and he is fairly young,

25   obviously, but when we look at statistical information, also

1     from the Sentencing Commission, and we look at, for example,

2     the 2016 report, Recidivism Among Federal Offenders:   A

3     Comprehensive Overview, criminal history is an indication of

4     likelihood of recidivism.   As number of points increase,

5     criminal history score increases, likelihood of recidivism

6     goes up.

7          Age is the opposite; the younger an individual is, the

8     higher risk of recidivism.   But in this particular case,

9     neither of those two factors would cause the Court to either

10     go higher in the guideline range or go below the guideline

11     range, but it is information that is noteworthy.

12          There is a need to avoid unwarranted sentencing

13     disparities among defendants with similar records who have

14     been found guilty of similar conduct.   And many of the

15     arguments that have been made with regard to average sentences

16     nationwide, either considering means or median numbers for

17     this type of an offense, a person in total offense level 41,

18     Criminal History Category 3, while that would be lower than

19     the guideline range, it's my determination that a sentence

20     within the guidelines for this particular offense and the

21     facts that are outlined in the presentence report would not be

22     an unwarranted sentencing disparity.

23          Instead, I do believe that to impose a sentence below the

24     guideline range would not take into account the very

25     seriousness of the offense, and the Court declines to do so

1    and will deny the motion for a variance.

2         I will announce the sentence.  It will be the sentence of

3    the Court pursuant to the Sentencing Reform Act of 1984, as

4    modified by the decisions in *Booker* and *Fanfan*, and I do find

5    the following sentence to be sufficient but not greater than

6    necessary to meet all of the purposes of Title 18, Section

7    3553(a).

8         And, therefore, it will be the judgment of the Court that

9    the defendant, William Ray Hargis, will be committed to the

10   custody of the Bureau of Prisons for a term of 360 months on

11   each of Counts 1 and 2; 240 months on Count 5, to run

12   concurrently with Counts 1 and 2; and 60 months on Count 4 to

13   run consecutively to Counts 1, 2, and 5, to produce a total

14   term of 420 months.

15        I will recommend to the Bureau of Prisons that during the

16   period of incarceration that the defendant participate in any

17   available substance abuse treatment program, and that he

18   participate in any available job skills and vocational

19   training programs for which he would qualify.

20        Finally, I will recommend that he participate in a mental

21   health program.  And subject to the provisions of Section 601

22   of the First Step Act, I will recommend that he serve the

23   period of incarceration at a location in South Carolina.  The

24   defendant does have family located in South Carolina, the

25   Court believes that that would be an appropriate location for

1    term of imprisonment.

2         Upon release, he will be placed upon supervision for a

3    term of five years on each of Counts 1, 2, and 4, and

4    three years on Count 5, with those terms of supervision to run

5    concurrently with each other, to produce a total term of

6    supervision of five years.  And within 72 hours of release

7    from the custody of the Bureau of Prisons, Mr. Hargis must

8    report in person to the probation office in the district in

9    which he is released.

10         Now, while on supervision, he may not commit another

11   federal, state, or local crime.  He must comply with the

12   mandatory and the standard conditions adopted by the Court and

13   that will be set forth in the judgment and commitment order.

14         The following special conditions will also be included.

15   The defendant must abstain from the use of alcohol; he must

16   refrain from obstructing or attempting to obstruct or tamper

17   in any fashion with the efficiency and accuracy of any

18   prohibited substance testing which is required as a condition

19   of release.

20         It's also necessary, in my opinion, that a search

21   condition be imposed in this matter based upon the

22   dangerousness that is presented by the defendant, as well as

23   the nature of the offense, or the offenses of conviction.

24   He'll be required to submit his person, as well as any

25   offices, properties, homes, residences, vehicles, storage

1    units, papers or computers, as well as any other electronic

2    communications or data storage devices, or media, to a search

3    conducted by the probation officer.

4         The failure to submit to a search would be grounds for

5    revocation of supervision, and he must warn all occupants that

6    his premises would be subject to a search according to this

7    condition.

8         He must also provide the probation office with access to

9    any requested financial information.  And the Court imposes

10   this particular condition to ensure that he does not reengage

11   in drug trafficking or criminal behavior.

12        At this time I do not find it necessary to impose the

13   special conditions with respect to the use of prescription

14   medications.  Although the Court does have the ability to

15   modify conditions of supervision when a person is placed upon

16   supervised release.  But at this point, in light of the

17   sentence that is being announced, I do not believe it's

18   necessary to include these particular conditions.

19        The defendant must also not purchase, possess, use,

20   distribute, or administer any controlled substance or

21   paraphernalia relating to controlled substances except as

22   prescribed by a physician.  And he may not use or consume

23   marijuana or marijuana products, even if that controlled

24   substance were to be prescribed to him by a physician,

25   licensed professional, or other person.

1     Based upon the current financial situation of the

2     defendant as reflected in the presentence report and

3     considering the factors of 5E1.2 subsection (d), subparagraphs

4     (1) through (8), I will waive the fine requirement and the

5     requirement for community restitution in the case.  I believe

6     that to impose a fine in addition to the other penalties would

7     create an undue hardship upon his children.  And, therefore,

8     the fine requirement is waived in this matter.

9         But he will be required to pay to the United States a

10    special assessment of $100 for each count of conviction for a

11    total of $400.  He'll also be required to forfeit any interest

12    that he might otherwise claim in the property that is listed

13    in the forfeiture allegation of the second superseding

14    indictment, which includes currency in the amount of $5,000,

15    any interest in the Yukon XL Denali, Kentucky license number

16    BRC-254, vehicle identification number 1GKS1JKJ6FR291107.

17        He'll also be required to forfeit the AR pistol, that's a

18    Panther Arms, serial number FFA060052; the AK-47, that's an

19    RML with an unknown serial number; the Panser Arms-AR12

20    bearing serial number YD2003082; the Federal Arms FR99, serial

21    number 20A1471; the Glock 30, serial number BRRV948, and all

22    assorted ammunition.

23        And then, following this proceeding, the defendant will

24    be remanded to the custody of the United States Marshal

25    pending designation for service of the sentence that has been

announced in this matter.

In the plea that was entered in the case, the defendant waived the right to appeal the guilty plea and conviction with the exception that he reserved the right to appeal the denial of his motions to suppress.  And he also reserved the right to appeal the final sentence in the case and, therefore, I will ask the clerk in just a moment to advise Mr. Hargis of his appellate rights.

Before I do that, I'll ask the attorneys to state any objections that they may have to the sentence that has been announced, and that would include conditions of supervised release.

Second would be any objections under *United States vs. Bostic*.  Under that decision from the Sixth Circuit, any objections not previously raised should be raised at this time so that they may be addressed by the Court to be properly preserved for review on appeal.

And then, finally, if either party would like the Court to make additional findings to support any of the matters that have been announced today, I'll certainly make those additional findings.

I'll also note for the record that all of the information that is contained in the sentencing memorandum has been considered and specifically the fact that this defendant has taken actions to better himself during the period of

1    incarceration, that has not gone unnoticed, and was of

2    assistance in keeping the Court from imposing a longer period

3    of incarceration in this particular case, based upon the very

4    serious nature of it.

5         Mr. West.

6              MR. WEST:  Yes, Your Honor.  I apologize, what was

7    the term of supervised release, again, please?

8              THE COURT:  The terms of supervised release were --

9              MR. WEST:  I'm sorry, the length.  How long it is,

10   sir.

11             THE COURT:  The length of supervision was five years

12   with regard to Counts 1, 2, and 4, and three years with regard

13   to Count 5.

14             MR. WEST:  Yes, sir, I apologize.  I was writing and

15   that didn't make it to my hand.

16        There are no objections from the United States in regards

17   to the sentence, or conditions of supervised release.  There

18   are no *Bostic* objections from the United States, and no

19   requests for further findings, sir.  Thank you.

20             THE COURT:  All right.  Thank you.

21        And Mr. Mashni.

22             MR. MASHNI:  Your Honor, for purposes of the record,

23   we would object to the denial of the request for the variance.

24             THE COURT:  All right.  That will be noted for the

25   record.  The defendant is not requesting any additional

33

1    findings to be made at this time; is that correct?

2         MR. MASHNI:  No, Your Honor.

3         THE COURT:  All right.  Thank you.

4    Madam Clerk, if you would please advise Mr. Hargis of his

5    appellate rights.

6         COURTROOM DEPUTY:  Yes, Your Honor.

7         (The form entitled "Court's Advice of Right to

8    Appeal" was read aloud in open court by the clerk, and said

9    form was signed by the defendant.)

10        THE COURT:  Thank you.  Counsel, if you'd like to

11   come up -- Mr. Mashni, if you would like to come up and pick

12   up that acknowledgment of rights that was just read, I'll ask

13   you and your co-counsel to review those rights with

14   Mr. Hargis.  And after he's assured himself that he

15   understands those rights, I'd ask he sign that original

16   document, and there's a copy that he can keep, of course, for

17   his records.

18        MR. MASHNI:  Can I approach?

19        THE COURT:  Yes, sir.

20   And Mr. West, do you have any other issues to take up in

21   the case on behalf of the government?

22        MR. WEST:  No, sir, thank you.

23        THE COURT:  Mr. Mashni, any other issues?

24        MR. MASHNI:  No, Your Honor.

25        THE COURT:  All right.  Thank you.  I believe our

34

1    next hearing is scheduled at 2:00 this afternoon.  We'll be in

2    recess until then.

3         (Proceedings concluded at 1:51 p.m.)

4                            - - -

5                   C E R T I F I C A T E

6         I, ELAINE S. HABERER, RPR, certify that the
     foregoing is a correct transcript from the record of
7    proceedings in the above-entitled case.

8

9    _/s/ Elaine S. Haberer___          August 29, 2022_
     ELAINE S. HABERER, RPR            Date of Certification
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25